**No. 21-55379**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

STARZ ENTERTAINMENT, LLC

*Plaintiff-Appellee,*

v.

MGM DOMESTIC TELEVISION DISTRIBUTION LLC,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
For the Central District of California, Western Division
No. 2:20-cv-04085, Hon. Dolly M. Gee

---

**BRIEF OF THE AUTHORS GUILD, INC. AND OTHER ARTISTS'
RIGHTS ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFF-APPELLEE SEEKING AFFIRMANCE**

---

Benjamin H. Diessel
Michael Rondon
WIGGIN AND DANA LLP
265 Church Street
One Century Tower
PO Box 1832
New Haven, CT 06508-1832
(203) 498-4400
bdiessel@wiggin.com
mrondon@wiggin.com

Nathan E. Denning
WIGGIN AND DANA LLP
437 Madison Avenue
35th Floor
New York, NY 10022
(212) 551-2600
ndenning@wiggin.com

*Attorneys for Amici Curiae*

# DISCLOSURE STATEMENT

The Authors Guild, Inc., the American Society of Media Photographers, Inc., The Dramatists Guild of America, the Graphic Artists Guild, the Romance Writers of America, the Songwriters Guild of America, Inc., and the Textbook & Academic Authors Association (together, "Amici") are non-profit organizations that have no parent corporations and issue no stock.

Date: November 3, 2021

*/s/ Benjamin H. Diessel*
Benjamin H. Diessel

*Attorney for Amici Curiae*

i

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................................. i

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF INTEREST .............................................................................1

PRELIMINARY STATEMENT .............................................................................3

ARGUMENT ..........................................................................................................6

    I.     American Artists Are in Crisis. ..................................................................6

         A.    Artists' Pay Is Rapidly Decreasing. ..............................................6

         B.    Infringement Is Rapidly Expanding. ...........................................10

         C.    Artists Already Face Serious Obstacles to Enforcing their Rights.....17

    II.    MGM's Proposed Rule Would Impose More Burdens on Artists, Further Reduce Their Opportunities for Income, and Make the Crisis Worse. ......20

    III.   MGM's Proposed Rule Would Ultimately Harm the Public. ....................24

CONCLUSION .....................................................................................................26

APPENDIX ...........................................................................................................28

CERTIFICATE OF COMPLIANCE ....................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Goldberg v. Cameron*,
 482 F. Supp. 2d 1136 (N.D. Cal. 2007)............................................................24

*Kirtsaeng v. John Wiley & Sons, Inc.*,
 136 S. Ct. 1979 (2016)......................................................................................25

*Navarro v. Procter & Gamble Co.*,
 515 F. Supp. 3d 718 (S.D. Ohio 2021) .............................................................22

*Nealy v. Atl. Recording Corp.*,
 No. 18-CIV-25474-RAR, 2021 WL 2280025 (S.D. Fla. June 4, 2021).............22

*Polar Bear Prods., Inc. v. Timex Corp.*,
 384 F.3d 700 (9th Cir. 2004) ..............................................................................4

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*,
 351 F.3d 1229 (D.C. Cir. 2003)..........................................................................17

*Sohm v. Scholastic Inc.*,
 959 F.3d 39 (2d Cir. 2020) ..........................................................................5, 22

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984)..........................................................................................24

*Werner v. BN Media, LLC*,
 477 F. Supp. 3d 452 (E.D. Va. 2020) ................................................................22

*William A. Graham Co. v. Haughey*,
 568 F.3d 425 (3d Cir. 2009) .............................................................................11

**Constitutional Provisions**

U.S. Const. art. I § 8 cl. 8.............................................................................................24

**Statutes and Rules**

17 U.S.C. § 504............................................................................................................4

17 U.S.C. § 507(b) ........................................................................4, 22

17 U.S.C. § 512(h) ...........................................................................17

Fed. R. App. P. 29 ..............................................................................2

**Legislative and Other Government Materials**

American Soc'y of Media Photographers, *Study on Remedies for Copyright Small Claims* (Jan. 16, 2012)................................................8

David Nimmer, *Proposal For Small Copyright Infringement Claims* (Jan. 17, 2012)...........................................................................8, 13

Graphic Artists Guild, *Remedies for Small Copyright Claims: Additional Comments* (Oct. 18, 2012) ..........................................11, 13

H.R. Rep. No. 116-252, Report to the Committee on the Judiciary, United States House of Representatives (Oct. 22, 2019) ..................19, 20, 25, 26

The Authors Guild, *In re: The State of Counterfeit and Pirated Goods Trafficking and Recommendations* (Jul. 29, 2019)..................................11, 15, 16

The Songwriters Guild of America and The Nashville Songwriters Association International, *In the Matter of Remedies for Small Copyright Claims* ....................................................................19

U.S. Bureau of Labor Statistics, *CPI Inflation Calculator* ........................................9

U.S. Copyright Office, *Copyright Small Claims: A Report of the Register of Copyrights* (Sept. 2013) ......................................................11, 17, 25

U.S. House, Comm. on the Judiciary, *Copyright and the Internet in 2020: Reactions to the Copyright Office's Report on the Efficacy of 17 U.S.C. § 512 After Two Decades* (Sept. 30, 2020) (statement of Rick Carnes, President, The Songwriters Guild of America) ..............................9

U.S. House, Comm. on the Judiciary, *Testimony of Jenna Close, Commercial Photographer On Behalf of Herself and the American Society of Media Photographers* (Sept. 27, 2018)................................................13

U.S. House, Comm. on the Judiciary, *The Case for Small Claims in America: Testimony of David P. Trust* (Sept. 27, 2018) ....................8, 13, 14, 18

U.S. House, Comm. on the Judiciary, *Statement of Karyn A. Temple, United States Register of Copyrights* (Jun. 26, 2019) ...................................18, 21

U.S. Sen., Comm. on the Judiciary, Subcomm. on Intell. Prop., *Section 512 Hearing: Is the DMCA's Notice-and-Takedown System Working in the 21st Century?* 4 (Jun. 2, 2020) (statement of Douglas J. Preston, President, The Authors Guild).....................................10, 12

**Other Authorities**

Alison Flood, *Plagiarism, "Book-Stuffing", Clickfarms . . . The Rotten Side of Self-Publishing*, The Guardian (Mar. 28, 2019).........................12

Ass'n of Am. Publishers, *AAP StatShot Annual Report: Book Publishing Revenues Up Slightly to $25.93 Billion in 2019* (Jul. 31, 2020) ........................................................................................................7

Brief of Amici Curiae Helienne Lindvall, David Lowery, Blake Morgan and the Songwriters Guild of America in Support of Respondent, *Google LLC, v. Oracle America, Inc.*, No. 18-956 (U.S. 2020) ...................................................................14

Compl., *Clinch v. Planet Productions, LLC, et al.*, 1:17-cv-04099 (S.D.N.Y. Jun. 1, 2017)..............................................16

David Kravets, *Piracy site for academic journals playing game of domain-name Whac-A-Mole*, Ars Technica (May 5, 2016) .............................12

David Streitfeld, *What Happens After Amazon's Domination Is Complete? Its Bookstore Offers Clues*, N.Y. Times (Jun. 23, 2019) ...........15, 16

Howard B. Abrams & Tyler T. Ochoa, The Law of Copyright § 16:16 .................12

Imke Reimers, *Can Private Copyright Protection Be Effective? Evidence from Book Publishing*, 59 J.L. & Econ. 411 (2016) ...........................10

InPaint, *How to Remove Watermark from a Photo* (last visited Oct. 14, 2021) ......................................................................................16

Intel. Prop. Off., *Online Copyright Infringement Tracker* (Mar. 2020).................10

Katy Guest, *"I Can Get Any Novel I Want In 30 Seconds": Can Book Piracy Be Stopped?*, The Guardian (Mar. 6, 2019)..............................................12

v

Nick Bilton, *Internet Pirates Will Always Win*, N.Y. Times (Aug. 4, 2012) ...............................................................................................12

Patrick Healy, *Offering Playwrights a Better Deal*, N.Y. Times (Nov. 4, 2014) ..................................................................................................9

Press Release, Digimarc, *E-Book Piracy Costs Publishers $315 Million in Lost Sales* (Mar. 14, 2017),..............................................10

The Authors Guild, *Presentation on U.S. Published Book Author Income Survey* (Jan. 2019)......................................................7, 8, 26

The Authors Guild, *Six Takeaways from the Authors Guild 2018 Author Income Survey* (last updated Jan. 9, 2019) ...........................6, 7

The Graphic Artists Guild Handbook: Pricing & Ethical Guidelines (16th ed. 2021) ..............................................................................9

The Graphic Artists Guild Handbook: Pricing & Ethical Guidelines (11th ed. 2003) ..............................................................................9

Tom Gerken, *How bots are stealing artwork from artists on Twitter*, BBC (Dec. 17, 2019) .............................................................16, 17

## STATEMENT OF INTEREST

The Authors Guild, Inc. (the "Guild") is the nation's oldest and largest professional organization of writers. Since its founding in 1912, the Guild has served as the collective voice of American authors, and its membership today comprises approximately 11,500 writers of every kind—novelists in every genre, nonfiction writers, journalists, historians, poets, and translators. Guild members have won Pulitzer and Nobel Prizes, National Book Awards, and many other accolades.

The Guild defends and promotes the rights of all authors to write without interference or threat, and to receive fair compensation for that work. As an organization whose members earn their livelihoods through writing, the Guild has a fundamental interest in ensuring that works of authorship and rights of authors are protected online and in print, and that the hard work and talents of our nation's authors are rewarded so they can keep writing, as guaranteed by the Constitution.

The other organizations who join this brief represent, together, the nation's photographers, graphic artists, songwriters, dramatists, scholarly authors, and other artists.[1] Each organization works to defend and promote the rights of artists to

---

[1] They are the American Society of Media Photographers, Inc., The Dramatists Guild of America, the Graphic Artists Guild, the Romance Writers of America, the Songwriters Guild of America, Inc., and the Textbook & Academic Authors Association. Their descriptions are set forth in the Appendix to this brief.

make and receive fair compensation for their works, and each has a fundamental interest in ensuring that copyright law develops in a way that best promotes the advancement of the creative arts.

All parties have consented to Amici's filing of this brief. *See* Fed. R. App. P. 29(a)(2), (a)(4)(D). This brief was authored by Amici and their *pro bono* counsel at Wiggin and Dana LLP. No party's counsel authored the brief in whole or in part, and no one—other than Amici and their counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## PRELIMINARY STATEMENT

The Court's decision in this case will have significant consequences for American artists (including authors, photographers, graphic artists, songwriters, dramatists, and others), most of whom are self-employed workers who earn only a modest living from their creations and lack any systematic means to identify infringements. For them, a "strict three-year limit" on recoverable damages regardless of when a claim accrues would be a serious hardship. And, as they suffer from it, so will we all.

Artists today are under more financial pressure than at any other time in recent history. For example, with their earnings declining 42 percent over the last decade, most authors can hardly afford to keep writing. And many, forced to take on other work, now write less or not at all. Photographers, songwriters, and other artists face similar pressures, having little to no extra income or time to spend policing infringements.

At the same time, infringement has become easier to commit, harder to detect, and tougher to litigate. Advancements in technology have lowered barriers to infringement and have improved the quality of counterfeits to the point where it can be impossible to differentiate them from legally published works. Today, anyone with a computer can create pirated copies of ebooks and audiobooks and sell them online, leading to a huge proliferation of commercial ebook and

3

audiobook piracy.  Likewise, infringement of photographs, songs, and other art—particularly but not exclusively online—is rampant.

Moreover, even where artists discover infringement, they face obstacles to enforcing their rights.  Infringers are often able to hide behind online anonymity and avoid enforcement by moving infringing content between different pseudonyms and online platforms.  And, even where these infringers can be identified and pursued in theory, the costs of litigation and the unwillingness of attorneys to take on cases of limited monetary value means the federal courts are effectively closed to many artists.

For artists who are able to bring an infringement action, they must do so within three years after "the claim accrued."[2]  The discovery rule serves a critical function here by setting the date "the claim accrued" as the date on which the artist becomes (or reasonably should have become) aware of the infringement.[3]  In doing so, the discovery rule ensures that meritorious infringement actions are not unfairly time-barred.  If an "action" is timely brought pursuant to the discovery rule, the Copyright Act on its face permits an artist to recover damages and other relief;[4] there is no separate limitations period for damages apart from the limitation on "action[s]" in Section 507(b).

---

[2] 17 U.S.C. § 507(b).
[3] *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004).
[4] *See* 17 U.S.C. § 504.

Defendant-Appellant MGM, however, in derogation of this clear text, asks the Court to "'explicitly disassociate[]' the issue of accrual from the issue of the extent of relief available" and impose a "strict three-year limit" on recoverable damages.[5]  Under MGM's approach, an artist who learns of an infringement occurring more than three years ago would be entirely barred from collecting any damages, whether or not the infringement action is timely.  Individual artists would lose the ability to collect damages for infringements that, through no fault of their own, they are not able to uncover promptly.  By contrast, copycats and other similar bad actors would benefit.

By sharply limiting the ability of blameless artists to recover damages, MGM's proposed rule would also devalue copyrighted works and further discourage the private enforcement of infringements on which the Copyright Act depends.  This would leave artists—who lack the financial resources of a large company like MGM, which might be able to afford to devalue its own works— with even less ability and incentive to bring lawsuits to protect their works, and thus less ability and incentive to create those works in the first place.  Ultimately, the public would suffer.

---

[5] Opening Br. for Appellant at 24 [hereinafter Appellant's Br.] (quoting *Sohm v. Scholastic Inc.*, 959 F.3d 39, 52 (2d Cir. 2020)); Appellant's Br. at 1.

## ARGUMENT

Pay for artists has gone down dramatically over the last several years. (*Infra* Section I.A.) At the same time, it has become easier for bad actors to infringe works and to do so at scale and with high-quality copies, making it hard for artists to police infringements. (*Infra* Section I.B.) Even when an artist finds an infringement, he or she already faces tremendous challenges in obtaining legal relief. (*Infra* Section I.C.) This dynamic would only worsen under MGM's proposed rule (*infra* Section II.), which would harm artists and the public interest (*infra* Section III.).

## I. American Artists Are in Crisis.

### A. Artists' Pay Is Rapidly Decreasing.

Artists today face unprecedented financial pressures. For example, authors earn far less income from publishing works than they have in the past. In a 2018 Guild survey of more than 5,000 respondents, published authors in America reported a 42-percent decline in median earnings from writing-related activities over the past decade.[6] More than 40 percent of authors reported that their book-

---

[6] *See* The Authors Guild, *Six Takeaways from the Authors Guild 2018 Author Income Survey* (last updated Jan. 9, 2019) [hereinafter Income Survey], https://www.authorsguild.org/industry-advocacy/six-takeaways-from-the-authors-guild-2018-authors-income-survey/.

related income had fallen from where it was five years earlier.[7] As it stands now, full-time authors earn a median of just $20,300 a year, with just one out of every three making more than $50,000.[8]

Much of this decline is driven by the fact that authors are earning less money from their core product—writing. Full-time authors reported that book royalties are down to a median of just $12,400 a year, for example, with only a fifth of authors earning all of their income from writing books.[9] As their income from writing has slipped, authors have been forced to write less and instead to look elsewhere—to speaking engagements, teaching, editing, and other non-writing activities—to earn a living.[10] This pinch on individual authors reflects a broader reality. The publishing industry as a whole lost $2 billion in revenues over the last four years.[11]

---

[7] *See* The Authors Guild, *Presentation on U.S. Published Book Author Income Survey* 9 (Jan. 2019) [hereinafter Income Survey Presentation], https://www.authorsguild.org/wp-content/uploads/2019/01/Authors-Guild-U.S.-Published-Author-Income-.pdf.

[8] *See id.* at 34; Income Survey.

[9] *See* Income Survey Presentation 7.

[10] *See* Income Survey; Income Survey Presentation 18.

[11] *See* Ass'n of Am. Publishers, *AAP StatShot Annual Report: Book Publishing Revenues Up Slightly to $25.93 Billion in 2019* (Jul. 31, 2020), https://publishers.org/news/aap-statshot-annual-report-book-publishing-revenues-up-slightly-to-25-93-billion-in-2019/#:~:text=The%20Association%20of%20American%20Publishers,2.76%20billion%20units%20were%20sold (reporting a decline from $27.80 billion in 2015 to $25.93 billion in 2019).

Personal stories from authors echo the hardships reflected in the data:

- "I love writing books but the return on effort is limited. . . . I find myself having to decide if it is even possible to continue . . . ."

- "Right now, being an author feels like an expensive hobby."

- "If my husband wasn't keeping me and my family financially, I would not be able to write. So even though I am published by a Big Five publisher and have a New York agent, I have earned so little, my writing is realistically just a hobby."[12]

Other artists face similar challenges. As reported to Congress, photographers, for example, "work extraordinarily long hours and earn . . . on average just $34,000 a year."[13] They "tend to be small business owners; most are sole proprietors earning $50,000 dollars or less each year."[14] And they must also keep up with steep overhead costs. Evolving technology "make[s] the investment necessary to become and remain a professional photographer a staggering and constant burden."[15] Graphic artists have also seen their wages stagnate or decline.

---

[12] Income Survey Presentation 32.

[13] U.S. House, Comm. on the Judiciary, *The Case for Small Claims in America: Testimony of David P. Trust* (Sept. 27, 2018), https://docs.house.gov/meetings/JU/JU00/20180927/108733/HHRG-115-JU00-Wstate-TrustD-20180927.pdf.

[14] David Nimmer, *Proposal For Small Copyright Infringement Claims* (Jan. 17, 2012), https://www.copyright.gov/docs/smallclaims/comments/05_american_photographic_artists.pdf.

[15] American Soc'y of Media Photographers, *Study on Remedies for Copyright Small Claims* (Jan. 16, 2012), https://www.copyright.gov/docs/smallclaims/comments/04_asmp.pdf; *see id.* ("Where once a few camera bodies, lenses and strobes might be enough to get

According to data collected by the Graphic Artists Guild, typical income for illustrators—currently ranging from $45,500 to $64,250—has barely risen since 2003 and has actually declined considerably when accounting for inflation.[16] Songwriters and dramatists work under similar financial strain.[17]

---

started, now multiple computers, monitors, scanners, and storage devices are absolute requirements, in addition to cameras, lenses and lights. Further, while a professional camera body used to cost a thousand dollars or so, new professional quality, digital camera bodies now cost many thousands of dollars, even after adjusting for inflation.").

[16] *See* The Graphic Artists Guild Handbook: Pricing & Ethical Guidelines 196 (16th ed. 2021). The 2003 version of the handbook shows income for illustrators ranging from $30,750 to $57,250. *See* The Graphic Artists Guild Handbook: Pricing & Ethical Guidelines 115 (11th ed. 2003). Had illustrator salaries kept pace with inflation, the 2021 salary range would be approximately $46,000 to $85,000. *See* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm.

[17] *See* U.S. House, Comm. on the Judiciary, *Copyright and the Internet in 2020: Reactions to the Copyright Office's Report on the Efficacy of 17 U.S.C. § 512 After Two Decades* (Sept. 30, 2020) (statement of Rick Carnes, President, The Songwriters Guild of America), https://www.songwritersguild.com/docs/9-30-20-comments-house-judic-re-section-512-IP-1.pdf (explaining that "the US and global music creator community has been decimated over the past two decades even as music content was utilized as a primary driver (and in some cases such as stand-alone music streaming services the sole driver) in amassing enormous wealth for the multi-national Big Tech industry"); Patrick Healy, *Offering Playwrights a Better Deal*, N.Y. Times (Nov. 4, 2014), https://www.nytimes.com/2014/11/05/theater/offering-playwrights-a-better-deal.html (reporting on a 2009 survey that found "on average, playwrights earned $25,000 to $39,000 annually from their work, with about 62 percent making less than $40,000").

### B.    Infringement Is Rapidly Expanding.

Copyright infringers, by contrast, are thriving.  Infringement is more widespread and harder to prevent than ever, with works now consumed in many formats that have multiplied the opportunities for infringement.  Although traditional media remain popular, gone are the days when a book, photograph, or CD had to be physically copied to appropriate it.  Instead, these works are now commonly distributed and consumed as digital texts, images, and audio files.

The heavy toll the digital boom has imposed on artists is well-documented. For example, studies show that consumption of pirated digital works siphons off approximately 14 percent of ebook sales, costing publishers more than $300 million per year.[18]  And as the Guild informed Congress, "the number of piracy complaints handled by the Authors Guild has skyrocketed."[19]  Since just 2018, "the

---

[18] *See* Imke Reimers, *Can Private Copyright Protection Be Effective? Evidence from Book Publishing*, 59 J.L. & Econ. 411, 414 (2016) (concluding that, if an ebook is not actively protected against piracy, it will lose approximately 14 percent in sales); Press Release, Digimarc, *E-Book Piracy Costs Publishers $315 Million in Lost Sales* (Mar. 14, 2017), https://www.prnewswire.com/news-releases/e-book-piracy-costs-publishers-315-million-in-lost-sales-300423534.html (according to a Nielsen study, ebook piracy cost publishers $315 million in 2017); *see also* Intel. Prop. Off., *Online Copyright Infringement Tracker* (Mar. 2020), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1000795/OCI-report-2020.pdf (according to a recent study by the United Kingdom, 17 percent of respondents had used an illegal source for ebooks within the last three months).

[19] U.S. Sen., Comm. on the Judiciary, Subcomm. on Intell. Prop., *Section 512 Hearing: Is the DMCA's Notice-and-Takedown System Working in the 21st Century?* 4 (Jun. 2, 2020) (statement of Douglas J. Preston, President, The Authors

number of piracy and counterfeiting issues reported to the Authors Guild's legal department has increased at least tenfold."[20]  The problem is not unique to written works.  According to a survey of visual artists submitted to Congress, for example, more than 60% of respondents had found an infringement of their work, and more than 70% of them reported that the infringement appeared online.[21]

At the same time, policing these infringements has unquestionably gotten harder.  Infringing works are now distributed online at massive scale for virtually no cost by a sea of largely anonymous infringers operating around the world.  This proliferation of infringing content on the internet makes policing infringement an inherent challenge.[22]  In practice, artists often compare the process to a game of

---

Guild),
https://www.judiciary.senate.gov/imo/media/doc/Preston%20Testimony.pdf.

[20] The Authors Guild, *In re: The State of Counterfeit and Pirated Goods Trafficking and Recommendations* (Jul. 29, 2019),
https://www.authorsguild.org/wp-content/uploads/2019/09/Authors-Guild-Comments.DOC-Counterfeiting-1.pdf.

[21] Graphic Artists Guild, *Remedies for Small Copyright Claims: Additional Comments* (Oct. 18, 2012),
https://www.copyright.gov/docs/smallclaims/comments/noi_10112012/GAG_NOI2_Remedies_for_Small_Copyright_Claims.pdf.

[22] *See, e.g.*, *William A. Graham Co. v. Haughey*, 568 F.3d 425, 437 (3d Cir. 2009) ("Technological advances such as personal computing and the internet have ma[de] it more difficult for rights holders to stridently police and protect their copyrights." (internal quotation marks and citation omitted)); U.S. Copyright Office, *Copyright Small Claims: A Report of the Register of Copyrights* 1 (Sept. 2013), https://www.copyright.gov/docs/smallclaims/usco-smallcopyrightclaims.pdf ("While infringement is nothing new when it comes to the world of creative works, there is no question that it has proliferated with the ascendance of digital culture . . . Today it is not only easy to make unauthorized copies, but to do so at virtually

11

whack-a-mole.[23]  For example, an artist might successfully have an infringing copy

taken down, only to see it uploaded again the next day.[24]  Or an artist might

convince a court to order a website that hosts infringing works to take the content

down, only to watch the site change its domain.[25]  Or after an artist manages to

---

no cost, much to the detriment of authors and the market for their works"); Howard
B. Abrams & Tyler T. Ochoa, The Law of Copyright § 16:16 ("The owner of a
copyright simply cannot know of every infringement when it occurs, particularly in
today's world of a global internet which can hide either the infringement or the
infringer or both.").

[23] *E.g.*, U.S. Sen., Comm. on the Judiciary, Subcomm. on Intell. Prop., *supra* note
19, at 6 ("The 'whack-a-mole' metaphor in the context of online piracy captures
the diffuse and ephemeral nature of pirate activities . . . ."); David Kravets, *Piracy
site for academic journals playing game of domain-name Whac-A-Mole*, Ars
Technica (May 5, 2016), https://arstechnica.com/tech-policy/2016/05/piracy-site-
for-academic-journals-playing-game-of-domain-name-whac-a-mole/ (reporting
that a popular piracy site for academic publications engaged in "a game of domain-
name Whac-A-Mole in response to [a publisher] winning court orders" for
takedowns); Nick Bilton, *Internet Pirates Will Always Win*, N.Y. Times (Aug. 4,
2012), https://www.nytimes.com/2012/08/05/sunday-review/internet-pirates-will-
always-win.html ("Stopping online piracy is like playing the world's largest game
of Whac-A-Mole.").

[24] *E.g.*, U.S. Sen., Comm. on the Judiciary, Subcomm. on Intell. Prop., *supra* note
19 ("'You can take down a book on one site and it will pop up on another site or
even on the same site the very next day because someone else has uploaded it.'").

[25] *E.g.*, Katy Guest, *"I Can Get Any Novel I Want In 30 Seconds": Can Book
Piracy Be Stopped?*, The Guardian (Mar. 6, 2019),
https://www.theguardian.com/books/2019/mar/06/i-can-get-any-novel-i-want-in-
30-seconds-can-book-piracy-be-stopped ("One of the most persistent ebook pirate
sites has been taken down multiple times, only to pop back up again under a .com,
a .net and a .org domain name.").

have an infringer barred from a sales platform, he or she will see the same infringer on the same platform a few days later, under a different pseudonym.[26]

This problem is well-illustrated by the challenges photographers face. They typically create large numbers of works, which, by their nature, can easily be copied from online sources.[27] Surveys on behalf of Amici indicate that approximately two-thirds of photographers and graphic artists have identified infringement of their works.[28] As one professional photographer told Congress:

> Regrettably, like so many other visual artists, [my partner] Jon and I often find our works infringed—an exceedingly easy thing to do in our digital world. We regularly discover our photos lifted from our website by unscrupulous infringers who have no interest in paying the going license fees.[29]

---

[26] *E.g.*, Alison Flood, *Plagiarism, "Book-Stuffing", Clickfarms . . . The Rotten Side of Self-Publishing*, The Guardian (Mar. 28, 2019), https://www.theguardian.com/books/2019/mar/28/plagiarism-book-stuffing-clickfarms-the-rotten-side-of-self-publishing (reporting on several "scammer[s] banned by Amazon to apparently return under a new name").

[27] *See* Nimmer, *supra* note 14 ("While the intrinsic cost of doing business has increased for photographers, the advent of the digital age has, at the same time, engendered a dramatic increase in the volume of copyright infringement of graphic works. Purloining of such works, whether produced for use by multi-national corporations for advertising purposes, use on apparel, product packaging or reportage, has become routine.").

[28] U.S. House, Comm. on the Judiciary, *supra* note 13 ("70 percent of professional photographers have suffered multiple infringements over the last few years"); Graphic Artists Guild, *supra* note 21 ("Sixty-one percent of respondents reported to have had their work infringed . . . .").

[29] U.S. House, Comm. on the Judiciary, *Testimony of Jenna Close, Commercial Photographer On Behalf of Herself and the American Society of Media Photographers* (Sept. 27, 2018), https://republicans-judiciary.house.gov/wp-content/uploads/2018/09/Jenna-Close-Witness-Testimony-9.27.18.pdf.

Others have noted that "[t]he burden of policing infringements stretches the resources of artists and business owners and their representatives."[30]

Songwriters face similar problems, as they recently recounted in an amicus brief to the Supreme Court:

> Five-time Grammy Award winner and independent composer and band leader Maria Schneider gave an example of this culture [of infringement] in comments to the Copyright Office: As just one small example, just put in the YouTube "search" bar the phrases "fair use" and "full CD." There are literally countless whole albums digitally uploaded by users who state that it is "fair use" (which it obviously isn't). [31]

The Complaint in this case is a testament to the difficulty of policing infringement in the digital realm, even for a corporation with considerable resources. Starz allegedly first identified MGM's infringement only some years after the fact when a Starz employee happened across an infringing movie on Amazon's streaming service.[32] Later, Starz allegedly learned of infringement of more than 300 other works following its own investigation and communications

---

[30] U.S. House, Comm. on the Judiciary, *supra* note 13.

[31] Brief of Amici Curiae Helienne Lindvall, David Lowery, Blake Morgan and the Songwriters Guild of America in Support of Respondent, *Google LLC, v. Oracle America, Inc.*, No. 18-956 (U.S. 2020), https://www.supremecourt.gov/DocketPDF/18-956/133298/20200218155210566_18-956%20bsac%20Helienne%20Lindvall%20et%20al--PDFA.pdf.

[32] *See* ER-025-26 ("STARZ first became suspicious that MGM might have violated the terms of the Library Agreements after a STARZ employee discovered that Bill & Ted's Excellent Adventure—a film that should have been exclusive to STARZ—was available for streaming on Amazon.").

14

with MGM counsel.[33] These allegations mirror the experience of rightsholders in general—regardless of a party's resources and diligence, infringement in the digital realm is usually discovered "by happenstance" or "through chance discovery."[34]

Moreover, even if every individual artist could somehow police the entire digital landscape for possible infringements, it is getting harder to identify infringements offline, too. With pirated physical copies of books, for instance, authors were in the past often able to identify infringements because of their poor quality. If a reader complained of typos or smudged ink—hallmarks of piracy— the author could buy some of the books, confirm they were fakes, and take action.[35] But as print-on-demand ("POD") technology improves, these indicia of infringement are getting harder to detect or disappearing altogether.[36] As a result, the Guild reported to the Commerce Department, it is "seeing high-quality counterfeit copies that look like the original" and could only "wonder how many

---

[33] *See id.* (alleging that "after repeated communications from STARZ identifying additional Pictures in breach, MGM . . . sent STARZ a list" of other breaches and that "STARZ's own investigation has uncovered nearly 100 additional" breaches).
[34] *See* The Authors Guild, *supra* note 20, at 11, 12.
[35] *See, e.g.*, *See* David Streitfeld, *What Happens After Amazon's Domination Is Complete? Its Bookstore Offers Clues*, N.Y. Times (Jun. 23, 2019), https://www.nytimes.com/2019/06/23/technology/amazon-domination-bookstore-books.html (describing how one publisher discovered infringements only because an employee read a review on Amazon that complained about the quality of the printing; test purchases confirmed that the books were pirated).
[36] *E.g.*, *id.* ("a keen-eyed customer" spotted a counterfeit only by noticing that it was larger than the original).

more counterfeits, especially high-quality ones, are being offered by third-party sellers that have not been identified."[37]  Exacerbating this recent trend, POD publishers "are not incentivized to alert authors or publishers that someone is counterfeiting their books, since counterfeiters boost POD revenues."[38]  So even the more obvious infringements can go unreported.

Similarly, digital works of graphic artists can increasingly be pirated in physical form with disturbing ease.  Businesses offer software designed to remove digital watermarks, allowing users to easily misappropriate and commercialize copyrighted images.[39]  Even some major U.S. retailers have been accused of selling clothing with pirated images.[40]  And the process of identifying copyrighted images and selling merchandise featuring stolen versions of them has now been *automated*.  For instance, computer programs known as "bots" will monitor social media for triggering comments such as, "I'd love to have this on a shirt."[41]  If a

---

[37] The Authors Guild, *supra* note 20, at 3, 11.

[38] *Id.* at 6 n.16; *e.g.*, Streitfeld, *supra* note 35 (reporting how one POD publisher "acknowledged that he had not told . . . the copyright owner[] that its rights were violated").

[39] *E.g.*, InPaint, *How to Remove Watermark from a Photo* (last visited Oct. 14, 2021), https://theinpaint.com/tutorials/online/how-to-remove-watermark-from-photo (explaining how to use the company's software to remove watermarks).

[40] *See, e.g.*, Compl., *Clinch v. Planet Productions, LLC, et al.*, 1:17-cv-04099 (S.D.N.Y. Jun. 1, 2017) (alleging that major retailers Urban Outfitters and Forever 21 had sold shirts bearing misappropriated images of the rapper Tupac Shakur that had been taken by the plaintiff).

[41] Tom Gerken, *How bots are stealing artwork from artists on Twitter*, BBC (Dec. 17, 2019), https://www.bbc.com/news/technology-50817561.

particular image gets a threshold number of comments, the bot will issue an order to a third-party vendor to print and sell shirts with the image.[42] Just as with written works, the volume and quality of the infringements mean that discovery often occurs by chance.[43]

### C. Artists Already Face Serious Obstacles to Enforcing their Rights.

What is more, even if an artist finds an infringement promptly, there are still serious barriers to enforcement.

Among them, infringers can be virtually impossible to identify.[44] Legal mechanisms intended to help copyright holders find infringers[45] are often ineffective.[46]

Even in the best-case scenario, where an artist knows all the facts and finds the right person to sue, the complexity and cost of federal civil litigation make

---

[42] *Id.*

[43] *Id.* ("'It happens every few months or weeks,' said Missy Pena, a freelance illustrator based in Washington. 'I don't go looking for it anymore, but people who know my work will reach out to me when they find another site selling my fan art on shirts.'").

[44] *See*, *e.g.*, U.S. Copyright Office, *supra* note 22, at 18 ("[A] copyright owner seeking to pursue an infringement claim must first identify and locate the alleged infringer. In the internet age—where wrongdoers can act anonymously—this can be difficult.").

[45] *E.g.*, 17 U.S.C. § 512(h) ("Subpoena to identify infringer").

[46] *E.g.*, *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1233 (D.C. Cir. 2003) (holding that a subpoena under § 512(h) generally may not be used to compel internet service providers to provide information about subscribers who are infringing on others' works).

enforcement unrealistic in most cases. The United States Register of Copyrights

recently outlined these challenges to Congress:

> In 2017, the median cost to litigate a copyright infringement suit with less than \$1 million at stake was estimated at \$200,000. Given the complexity of complying with the Federal Rules of Civil Procedure and Federal Rules of Evidence, as well as the vigorous motion practice typical of infringement cases in district court, few parties would be capable of proceeding without an attorney. However, according to a survey conducted by the American Bar Association's section on intellectual property law, only thirty-two percent of the lawyers surveyed indicated that they would be willing to accept a case with less than \$30,000 at stake, which would exclude many individual artists and creators from representation. . . . Overall, this situation means that low-dollar but still valuable copyrighted works often may be infringed with impunity, with individual creators and small businesses often lacking an effective remedy.[47]

This dynamic, two Amici reported to Congress, is frequently "exacerbated by the

fact that [individual artists] are often opposed by large corporations with limitless

resources and the resolve to complicate and protract a case in hopes that the

plaintiff runs out of patience, money or both."[48] Although it might seem

unimportant that an artist cannot make a federal case out of these "small claims

and random infringements," "taken in the aggregate, they have an effect on the

---

[47] U.S. House, Comm. on the Judiciary, *Statement of Karyn A. Temple, United States Register of Copyrights* (Jun. 26, 2019) (footnotes omitted), https://www.copyright.gov/laws/hearings/testimony-of-karyn-temple-for-june-26-oversight-hearing.pdf.
[48] U.S. House, Comm. on the Judiciary, *supra* note 13.

livelihoods of individual creators akin to the infamous torture 'death by a thousand cuts.'"[49]

To be sure, the recent passage of the Copyright Alternative in Small-Claims Enforcement ("CASE") Act mitigates some of these problems. It removes some of the procedural burdens for low-value cases by creating a "small claims" court for copyright violations and reducing the need for attorneys.[50] Indeed, it was animated by some of the concerns highlighted in this brief, including an intent to ensure "individual creators, many of whom rely upon the promise of exclusive rights associated with the grant of copyright to earn a living and provide for their families[,] have a realistic ability to enforce those rights."[51] And it "reflects the Congressional determination" that "a modern copyright system" must "effectively promote the creation and distribution of new works, in order to ensure that creators can obtain a monetary return on their investment of time, energy, and ingenuity into the creative process."[52]

---

[49] The Songwriters Guild of America and The Nashville Songwriters Association International, *In the Matter of Remedies for Small Copyright Claims*, https://www.copyright.gov/docs/smallclaims/comments/51_songwriters_guild.pdf.

[50] *See* H.R. Rep. No. 116-252, Report to the Committee on the Judiciary, United States House of Representatives 20 (Oct. 22, 2019), https://www.congress.gov/116/crpt/hrpt252/CRPT-116hrpt252.pdf.

[51] *Id.* at 19 (internal quotation marks and alterations omitted).

[52] *Id.* at 20.

But pursuing a claim under the CASE Act comes with what can be deal-breaking tradeoffs. Relevant here, an artist might have to forego damages that would be available in federal court. "Total damages are limited to $30,000 or less" and adjudicators are "flatly prohibited . . . from enhancing statutory damages for willful infringement, which plaintiffs often seek in federal court."[53] Moreover, in some instances, a CASE Act plaintiff may have a *higher* burden than in federal court. For example, if an infringing defendant fails to appear, a federal court can grant relief based on the pleadings.[54] By contrast, under the CASE Act, the plaintiff must *prove* liability and damages with affirmative evidence even as to a defaulting defendant.[55] The federal judiciary therefore continues to serve a critical role in protecting the rights of artists.

## II. MGM's Proposed Rule Would Impose More Burdens on Artists, Further Reduce Their Opportunities for Income, and Make the Crisis Worse.

If the Court were to adopt MGM's rule, it would place a substantial additional burden on artists—burdens that they cannot feasibly bear. It is simply unrealistic to expect individual artists, most of whom are of modest means, to have the resources at their disposal to systematically monitor the entire digital and print

---

[53] *Id*. at 25.
[54] *Id.* at 24-25.
[55] *Id.*

20

landscape for infringements. Yet that is in effect what MGM asks this Court to require.

Furthermore, policing infringements will continue to become harder as digital content continues to proliferate and the quality of pirated works continues to improve. MGM's proposed rule would diminish the role of delayed discovery at the same time infringements are becoming more difficult to discover.

Moreover, one of the central challenges artists face in pursuing meritorious cases—engaging competent counsel—will only become more difficult if potential damages, and thus expected recoveries, are slashed. If that proposition were not clear enough on its face, survey data from the American Bar Association proves it.[56] Retrospective damages are what drive the decision and ability to litigate—the lower the monetary value of a case, the more difficult it is to engage a suitable attorney.[57] And, if artists are unable to justify their costs of litigation by the prospect of recovering damages, then they will have no choice but to cede the value of their creations to infringers.

The discovery rule is responsive to these concerns. It preserves an artist's rights—and the value of his or her case—by tying the date of "accrual" (the term

---

[56] *See* Statement of Karyn A. Temple, *supra* note 47, at 13 ("[O]nly thirty-two percent of the lawyers surveyed indicated that they would be willing to accept a case with less than $30,000 at stake, which would exclude many individual artists and creators from representation.").
[57] *See id.*

used in Section 507(b)) to the reasonable discovery of the infringement and, thereby, tying the artist's right to recovery to the date he or she reasonably discovered the infringement.

MGM totally ignores the impossible burden it would impose on individual artists by divorcing damages from claim accrual. For instance, as described above, most individual artists lack the capacity to undertake the type of continuous monitoring and sustain the inevitable devaluation of their works that would flow from the rule MGM would like this Court to impose. If MGM's proposal becomes law, these burdens will fall not just on corporate entities, but also on individual, independent creators who are least able to bear them. The half-handful of cases MGM cites as having adopted its proposal in the wake of *Petrella* prove the point: Each of those cases involved an individual plaintiff whose recovery was purportedly time-barred.[58]

MGM's brief, which focuses on the effects of the discovery rule on large companies and popular works, misses this point entirely.[59] Instead, MGM points

---

[58] *See Sohm v. Scholastic Inc.*, 959 F.3d 39, 42 (2d Cir. 2020) (plaintiff was a professional photographer); *Nealy v. Atl. Recording Corp.*, No. 18-CIV-25474-RAR, 2021 WL 2280025, at *6 (S.D. Fla. June 4, 2021) (plaintiffs were an individual music producer and his company); *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 728 (S.D. Ohio 2021) (plaintiffs were a professional photographer and her eponymous company); *Werner v. BN Media, LLC*, 477 F. Supp. 3d 452, 453 (E.D. Va. 2020) (plaintiff was a professional photographer).
[59] *E.g.*, Appellant's Br. 16.

22

to its "widely popular" titles and argues that a strict three-year damages bar would "protect[] defendants from the prejudice of making *large investments* in a work only to be subject to infringement claims years later."[60] MGM does not explain why it would make a large investment in a work without first verifying the work's ownership. Nor does MGM explain why copyright law should reward those infringers who make the most from their infringements. It should be the reverse. But, in any event, MGM's sizable financial investments in infringing works have little to do with the common experience of individual artists. These artists face a never-ending swell of smaller-scale and largely anonymous infringement. And when, as is common for individual artists, an infringing work has little investment behind it and little visibility—such as the counterfeited books for sale on Amazon, photos used to promote a run-of-the-mill product, or songs anonymously posted on a torrent site—the discovery rule's preservation of both claims *and* damages plays a crucial role.

Similarly flawed is MGM's suggestion that its proposed strict three-year limit on damages would still leave creators with a "choice" about when to assert their claims.[61] The discovery rule is concerned only with those plaintiffs who are reasonably *unaware* of their claims; it offers no protection to those plaintiffs who

---

[60] *Id*. at 5, 16 (emphasis added).
[61] *Id*. at 27.

23

are aware of their claims but choose to delay pursuing them. When artists through no fault of their own are unaware of their claims, MGM's rule would leave them with *no* choice and *no* ability to recover.

Nor does the discovery rule create, as MGM suggests, "open-ended uncertainty and prejudice" for infringers.[62] Any such concerns are already addressed by the discovery rule itself, which has always been limited by the reasonableness of the plaintiff's unawareness of the claim.[63]

## III.   MGM's Proposed Rule Would Ultimately Harm the Public.

The Founders recognized, and the Constitution enshrined, a fundamental goal of encouraging artistic development.[64] This same goal lives on in our modern-day copyright regime. To ensure the public will benefit from access to valuable cultural works, our laws protect artists' rights in their work and, specifically, encourage private enforcement of infringements.[65]

---

[62] *Id.* at 4.

[63] *See Goldberg v. Cameron*, 482 F. Supp. 2d 1136, 1142-43, 1148 (N.D. Cal. 2007) (rejecting the plaintiff's argument that "he was unaware of the release of the *Terminator* movies and their potential connection to his works because of his twenty-year spiritual journey" during which he "shunned[] all forms of electronic media").

[64] *See* U.S. Const. art. I § 8 cl. 8 ("The Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . .").

[65] *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 428-32 (1984) ("The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate

24

The Supreme Court has recognized this framework on multiple occasions. Most recently, in *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016), the Court was asked to decide how lower courts should award attorney's fees in copyright cases. The Court repeatedly identified a need to "encourage" private parties to litigate meritorious suits.[66] Copyright law, the Court said, should provide a litigant who "is clearly correct" "an incentive to litigate the case all the way to the end."[67]

This Court should consider the scope of the discovery rule in that context. Individual authors and other artists are the major engine of creative output in the United States, and the public benefits from their works. As Congress has recognized, dismantling artists' rights in their works will only discourage them from creating more: "On a collective level, the inability to enforce rights corrodes

---

artistic creativity for the general public good." (internal quotation marks omitted)); s*ee also* H.R. Rep. No. 116-252, Report to the Committee on the Judiciary, *supra* note 50, at 20 ("The Copyright Clause embodies the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and investors and empowers Congress to create a system that promotes these goals." (internal quotation marks and footnotes omitted)); U.S. Copyright Office, *supra* note 22, at 1 ("As provided in the Constitution, the rights granted to authors are not merely to be articulated, but also 'secur[ed].'").

[66] *See Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1986 (2016) ("[F]ee awards . . . should encourage the types of lawsuits that promote [the] purposes [of the Copyright Act]."); *id.* (noting the need to "encourage such useful copyright litigation"); *id.* (adopting a rule that "encourages parties with strong legal positions to stand on their rights").

[67] *Id.*

respect for the rule of law and deprives society of the benefit of new and expressive works of authorship."[68]  If our nation's artists can no longer make a living from their works, it follows that art will become, as one author put it, just an "expensive hobby" reserved only for those who can afford to do it.[69]  Not only will the quantity of new works decline, many important voices will disappear entirely.

MGM's proposed rule does exactly the opposite of what copyright law broadly, and the discovery rule specifically, intend.  By reducing potentially recoverable damages, it will *devalue* artists' rights "to their respective Writings," it will *discourage* them from litigating meritorious suits, and it will *reduce* the quantity and quality of new works that are made available for the public's benefit.  While MGM, a company that proudly "controls the rights to distribute thousands of critically acclaimed feature films and television episodes,"[70] might be able to afford a devaluation of its content library, the artists who create these works cannot.

## CONCLUSION

For these reasons, Amici respectfully request the Court affirm the district court's decision.

---

[68] H.R. Rep. No. 116-252, Report to the Committee on the Judiciary, *supra* note 50, at 19 (internal quotation marks omitted).
[69] Income Survey Presentation 32.
[70] Appellant's Br. 5.

26

Date: November 3, 2021

/s/ *Benjamin H. Diessel*
Benjamin H. Diessel
Michael Rondon
WIGGIN AND DANA LLP
265 Church Street
One Century Tower
PO Box 1832
New Haven, CT 06508-1832
(203) 498-4400
bdiessel@wiggin.com
mrondon@wiggin.com

Nathan E. Denning
WIGGIN AND DANA LLP
437 Madison Avenue
35th Floor
New York, NY 10022
(212) 551-2600
ndenning@wiggin.com

*Attorneys for Amici Curiae*

## APPENDIX

The American Society of Media Photographers, Inc. (the "ASMP") is a 501(c)(6) non-profit trade association representing thousands of members who create and own substantial numbers of copyrighted photographs, films, and other creative works. These members all envision, design, produce, and sell their works in the commercial market to entities as varied as multinational corporations to local mom-and-pop stores, and every group in between. In its seventy-six-year history, the ASMP has been committed to protecting the rights of all visual creators.

The Dramatists Guild of America is the only professional organization promoting the interests of playwrights, composers, lyricists, and librettists writing for the stage. Established over 100 years ago for the purpose of aiding dramatists in protecting both the artistic and economic integrity of their work, The Dramatists Guild of America continues to educate, and advocate on behalf of, its over 8,000 members. The Dramatists Guild of America believes a vibrant, vital theater is an essential element of this country's ongoing cultural debate, and seeks to protect those individuals who write for the theater to ensure its continued success.

The Graphic Artists Guild (the "GAG") is a 501(c)(6) non-profit trade association which has advocated on behalf of graphic designers, illustrators, animators, cartoonists, comic artists, web designers, and production artists for fifty years. GAG educates graphic artists on best practices through webinars, Guild e-

28

news, resource articles, and meetups. The "Graphic Artists Guild Handbook: Pricing & Ethical Guidelines" has raised industry standards and provides graphic artists and their clients guidance on best practices and pricing standards.

Romance Writers of America ("RWA"), founded in 1980, is a nonprofit trade association, with a membership of more than 4,000 romance writers and related industry professionals, whose mission is to advance the professional interests of career-focused romance writers through networking and advocacy. RWA works to support the efforts of its members to earn a living, to make a full-time career out of writing romance—or a part-time one that supplements his/her main income.

The Songwriters Guild of America, Inc. (the "SGA") is the longest-established and largest songwriter advocacy and copyright administrative organization in the United States run solely by and for songwriters, composers and other music creators, as well as their heirs. It is registered as a non-profit corporation in the state of Tennessee pursuant to the Tennessee Nonprofit Corporation Act. Founded in 1931, SGA's organizational membership today stands at approximately 4,500 members, and through its affiliations with both Music Creators North America, Inc. (the "MCNA") (of which it is a founding member) and the International Council of Music Creators (the "CIAM") (of which MCNA is a key Continental Alliance Member), SGA is part of a global coalition of

29

music creators and heirs numbering in the millions. SGA is also a founding member of the international organization Fair Trade Music, which is the leading U.S. and international advocacy group for the principles of transparency, equitable treatment, and financial sustainability for all songwriters and composers.

The Textbook & Academic Authors Association (the "TAA") is the only nonprofit membership association dedicated solely to assisting authors of scholarly books, textbooks, and journal articles. Formed in 1987, the TAA has over 2,000 members, primarily consisting of authors or aspiring authors of scholarly books, textbooks, and academic articles. Many of the TAA's members serve on college or university faculties. TAA's mission is to support textbook and academic authors in the creation of top-quality educational and scholarly works that stimulate the love of learning and foster the pursuit of knowledge.

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

**This brief contains 6,972 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Date: November 3, 2021

*/s/ Benjamin H. Diessel*
Benjamin H. Diessel

*Attorney for Amici Curiae*

31